25cr 351 SMB/DJF

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | **INDICTMENT** |
| Plaintiff, | 18 U.S.C. § 1343 |
| | 18 U.S.C. § 981(a)(1)(C) |
| v. | 21 U.S.C. § 853(p) |
| | 28 U.S.C. § 2461(c) |
| CHRISTOPHER ADESOJI FALADE and EMMANUEL OLUWADEMILADE FALADE, | |
| Defendants. | |

THE UNITED STATES GRAND JURY CHARGES THAT:

At times relevant to this Indictment:

1. The defendants devised and carried out a scheme to defraud federally funded health care benefits collected within Minnesota's Housing Stability Services Program. That was a program designed to help people with disabilities and addictions find and maintain housing. Rather than provide such help, the defendants obtained and misappropriated millions of dollars in program funds that were intended as reimbursements for services provided to those people.

   **A.   Background on Minnesota's Housing Stability Services Program**

2. In July 2020, Minnesota became the first state in the country to offer Medicaid coverage for Housing Stabilization Services. The Housing Stabilization Services Program is a Medical Assistance (that is, Medicaid) benefit designed to help people with disabilities, including seniors and people with mental illnesses and substance use disorders, find and maintain housing.

SCANNED
SEP 17 2025
U.S. DISTRICT COURT MPLS

3. The Program permitted reimbursements for four principal kinds of services:

(a) Housing consultation, during which a consultant (like a social worker or nurse) helps a beneficiary complete a Department of Human Services form called a "Person-Centered, Housing Focused Plan." The Plan is a form available from the Department of Human Services. It requires minimal information. Consultants could bill Medicaid about $174 for a consulting session.

(b) Housing transition services, during which a provider helps a beneficiary plan for, find, and move into housing. Providers can bill about $68 per hour of transition services provided.

(c) Housing sustaining services, during which a provider helps a beneficiary keep their housing after they have moved in (including through behavioral management of the beneficiary). For sustaining services, too, providers can bill about $68 per hour.

(d) Moving expenses of up to $3,000, subject to conditions.

4. By design, the Program had a low barrier to entry for new providers. A would-be provider needed only be at least 18 years old, submit some enrollment paperwork to Minnesota Department of Human Services (DHS), undergo a background check, and complete about five hours of online training videos. Providers did not have to have a medical license or social work training.

5. Similarly, the Program had a low barrier to entry for beneficiaries. Beneficiaries needed only be at least 18 years old, have coverage under Medical Assistance (which is Minnesota's Medicaid program for people with low income), have a documented disability or "disabling condition," and be experiencing housing instability. Program rules defined those final two conditions expansively. To receive billable services, a beneficiary meeting these requirements just needed to complete, with a Program-qualified consultant, a document called a Housing Focused Plan,

2

detailing their housing challenges and needs. That done, the beneficiary could enroll with a provider. And the provider could start billing for services provided.

6. To bill, a provider needed to submit only the names of the beneficiaries serviced, the types of billable services provided, and the hours worked.

7. The HSS Program's low barriers to entry and minimal records requirements for reimbursement combined to make the Program susceptible to fraud.

8. Before the Program's inaugural year, DHS predicted the Program would cost about $2.6 million annually. That proved to be inaccurate. In 2021 alone, the Program paid out more than $21 million in claims. That figure ballooned in the following years: $42 million in 2022, $74 million in 2023, $104 million in 2024. In just the first six months of 2025, the Program paid out another $61 million.

9. A federal investigation revealed that many Program providers defrauded the system. These providers acquired the names of Program-eligible beneficiaries from facilities like addiction treatment centers. They then used those individuals' information to submit inflated and fake reimbursement claims. In this fashion, the providers acquired substantial pay-outs of taxpayer money to which they were not entitled. They used those ill-gotten gains for their own enrichment.

**B.     The Defendants and Their Roles**

10. EMMANUEL OLUWADEMILADE FALADE incorporated Faladcare Inc. in about October 2019. He then submitted paperwork to DHS in or about February 2023 to enroll Faladcare as an HSS Provider. That paperwork identified EMMANUEL FALADE as the company's "Owner" and CHRISTOPHER FALADE as the company's point of contact.

3

*United States v. Falade, et al.*

11.  CHRISTOPHER FALADE is the father of EMMANUEL FALADE. The FALADES worked together to operate Faladcare Inc. within the HSS Program.

12.  In these roles, the FALADES, along with their employees at Faladcare, were supposed to provide housing consulting, transitioning, and sustaining services to qualifying people in need. Faladcare was paid at quarter-hourly rates and with Medicaid dollars based on the services it claimed to have provided.

13.  In all, between approximately July 2020 and June 2025, Faladcare submitted reimbursement claims totaling over $2.2 million.

### The Scheme to Defraud the Housing Stability Services Program

14.  From in or about July 2020 through in or about June 2025, in the State and District of Minnesota, and elsewhere, the defendants,

**CHRISTOPHER ADESOJI FALADE and
EMMANUEL OLUWADEMILADE FALADE,**

and others known and unknown to the grand jury, did knowingly devise and participate in a scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts.

15.  The purpose of the scheme was to fraudulently obtain millions of dollars in Housing Stability Services Program funds by causing the submission of fake and inflated bills. As a Program provider, the FALADES were responsible for providing program-eligible housing services to people in need. However, in furtherance of the scheme, the FALADES and their conspirators caused the submission of false claims information that significantly overrepresented the hours of services they provided. In

4

so doing, the FALADES received HSS Program funds that substantially exceeded the services they and their company provided.

16. In furtherance of the scheme to defraud, in or about February 2023, EMMANUEL FALADE applied with DHS for Faladcare Inc. to operate as an HSS provider. The FALADES thereafter purported to service individuals in need through Faladcare from business offices in Little Canada and Woodbury, Minnesota.

17. From those locations, the FALADES claimed to service about 100 different beneficiaries and for such services claimed to be entitled to over $2.2 million. In reality, the FALADES' operations provided only a fraction of that claimed total. The FALADES diverted much of their fraud proceeds to their conspirators, including to their Faladcare employees.

### Counts 1-4
(Wire Fraud)

18. Paragraphs 1 through 17 are incorporated herein.

19. On or about the dates listed below, in the State and district of Minnesota and elsewhere, the defendants,

**CHRISTOPHER ADESOJI FALADE** and
**EMMANUEL OLUWADEMILADE FALADE,**

and others known and unknown to the grand jury, for the purpose of executing the scheme described above, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below for each count, each transmission constituting a separate count:

*United States v. Falade, et al.*

| Count | Date (on or about) | Wire Details |
|---|---|---|
| 1 | April 4, 2025 | An email to CHRISTOPHER FALADE and EMMANUEL FALADE attaching three documents and bearing the subject, "Fwd: Service Verification Forms" |
| 2 | March 31, 2025 | An email to CHRISTOPHER FALADE attaching a purported patient day sheet as a document named, "CCF_000271.pdf" |
| 3 | March 31, 2025 | An email to CHRISTOPHER FALADE attaching a purported patient day sheet as a document named, "CCF_000272.pdf" |
| 4 | May 22, 2025 | An email from EMMANUEL FALADE to HealthPartners with the subject line "Anna records HSS records" |

All in violation of Title 18, United States Code, Section 1343.

## FORFEITURE ALLEGATIONS

20.  Counts 1 through 4 of this Indictment are incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) in conjunction with Title 28, United States Code, Section 2461(c).

21.  If convicted of any of Counts 1 through 4 of this Indictment, the defendants shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense charged.

22.  If any of the above-described forfeitable property is unavailable for forfeiture, the United States intends to seek the forfeiture of substitute property as provided for in Title 21, United States Code, Section 853(p) as incorporated by Title 28, United States Code, Section 2461(c).

*United States v. Falade, et al.*

A TRUE BILL

_____     _____
ACTING UNITED STATES ATTORNEY        FOREPERSON